Good morning, Your Honors. I'm Ernest Franceschi. I represent the appellant and the plaintiff in this matter. If it would please the Court, there are two separate... I'm not observing any time for rebuttal. Five minutes, Your Honor. All right. That's aspirational, but I'll try to remind you if we're not asking you questions. Okay. Thank you, Your Honor. We have two different defendants here. They both started with motions that dismissed. One was granted against the city. The other motion that dismissed was converted to a motion for summary judgment. And that's against the airport defendants. So I'd like to start with the airport defendants first. And there's some problems with the trial court's ruling on that summary judgment. For one, the court found that the continuing violation doctrine applies. But what the court did find, and there's really no basis for it, and it's an erroneous ruling, is that there is a reaffirmation of a preexisting act. And the problem with that ruling... Well, okay. I know what you're talking about. You're talking about the fence, right? Yes, Your Honor. And so if under the continuing violations doctrine you need to show that later acts inflict a new injury, what new antitrust injury did the fence inflict since you've alleged that you were already excluded from the airport? You know, I guess I kind of want to just... You know, you can address this as you see fit, and I don't want to seem... with the fact that your client knew that he wasn't going to get to do fuel from very early on. There were certain exclusions that your client tried to get rid of but never was successful in getting rid of that. And there's an email that talks about that they know that they were already excluded. And so just like the other case that you just listened to, it's all about the roof. You're trying to make it all about the fence. And I'm struggling with antitrust and offense. But I'm also struggling with the knowledge that your client clearly seemed to have had from... So I want to give you an opportunity to dispel me of that, because if he knew about that all the time and just wants to take every tact to try to get to do the fuel, I thought the statute of limitations is just ringing large in my ears. Well, your honor, let me address that. But it's not just about the fence. 2017 was a very momentous year. On April 1st, 2017, my clients received their fuel concession, the permission by the city to sell fuel. They didn't have that before. Once that happened, a plethora of actions took place. But how does that override that they have this, that your client had that excluding covenant? Well, the excluding covenant is in and of itself an antitrust violation. It's per se anti-competitive. And a superior court judge found that wasn't enforceable. That's the anti-competitive violation. That's certainly been known loud and clear since 2009. But the problem is that the statute of limitations lapsed since 2009. It got reinstated once there was a new violation. And let me explain how the fence is a violation. The fence wasn't there. There's tribal issues. Is the restrictive covenant still a barrier to your client, or is that gone? I know there's language in the briefing and stuff about this restrictive covenant. Some court struck it down, but did it come back or something, or what? Well, it's in a state of flux in the superior court. Still being litigated? Yes, one superior court judge. Let me ask you this. Let's say you've got several things that are keeping you from doing something, right? I think this comes down to what Judge Connell was talking about. The second part of the continuity violations doctrine talks about, is it a new injury? And what I'm having trouble with is, does something count as a new injury? If there's two things that are anti-competitive in keeping you from entering the market, and maybe one doesn't start until later and the other one doesn't. So you get rid of the one, let's say, but the other one comes in right on it. You have a pretty clever opponent, so they have the next shoe drops right then, and they bring in this other thing, but they both do the same thing. They both keep you from, so in theory, they're both the same injury. But it seems a little bit odd to me to characterize them both as the same injury, because otherwise you could just continue stacking on different things that keeps you from entering the market, different actions, and as your client gets them out of the way, but they all count as the same injury. That seems to be an odd one. So how do you read the second part of the continuity violations thing, which is it has to be a new and continuing injury or something like that? Sure. Well, accumulating the camera. Well, prior to April 1, 2017, appellants were not able to sell fuel quality. They didn't have the fuel concession. They obtained it on April 1, 2017. Now, following that, once the city granted that concession and the defendants vehemently objected, they petitioned the city not to grant it. Once they granted it, they asked for it to be revoked. They filed a nuisance lawsuit. They filed an arbitration action. They did a whole bunch of stuff after April 1, 2017. Now, when all that went by the wayside, they decided to erect that fence, that barrier. Because this is covenant, right? They have the covenant that keeps the, you know, they have several barriers. They have a physical barrier now, but they also have the covenant. So why, my question is, they both seem to kind of accomplish the same thing, right? They both keep you from competing, which can always be the case. Your injury in an antitrust case will always be that you can't compete. But why is that not under the second part of the test? Why is that not the, why is it not a, you know, the continuing violations doctrine says it has to inflict a new and accumulating injury. It seems like, you know, you could argue that they're both the same injury. They're just, so you can use ten different things in a row, is my point. Why is it a new injury each time you bring in the next? Well, it's a new injury because there were no fuel sales prior to 2017. We didn't have any fuel sales. I mean, let's just say there was fuel sales. Like, let's say you had like a month in between. You were selling fuel furiously, and then they bring in the new thing, and it stops you. But that's the same injury you had before, is that you couldn't sell fuel. So that's just the same, so that's, you know, and you've got, you've got, you keep getting hit with the same injury. It's a different cause of the injury. Instead of shooting you in the foot, I'm now knifing you in the foot or stomping on your foot or whatever, but I'm still just injuring your foot. Like, what is, you think that new and accumulating injury turns on the type of injury you're experiencing, or does it turn on also what is causing the injury? Well, the fact that it's the word new means just that. It's a new injury, and what we have. It's not the same type, you're thinking. It could be the same type, but it's a new injury. It probably would be the same type, presumably. It's new, and it's accumulating. It would always be the same type because it's an antitrust case. It would be preventing you from entering the market. Right, but the newness aspect of the injury is now they've set up a barrier to prevent pilots that are taxiing on the taxiway from seeing the fueling facility, and it's accumulating because it's ongoing from that point forward. So, it is a new and accumulating injury. But what the district court ruled is. And, let me, doesn't all the discussion of the restrictive fuel covenant in the purchase negotiations suggest that Mr. Wolf was working towards selling fuel from the very beginning? No, Your Honor. Mr. Wolf was an aerial cinematographer. What he wanted was to secure a facility to house his aircraft that he uses in shooting featured films and commercials. But he was always talking about selling fuel from the very beginning. Well, he wanted to have the ability to fuel his own aircraft there. He was never in the business, and never wanted to be in the business of being a full-service FBO. Counsel, what if we disagree? What if we read this, and I think, man, your client's a pretty clever guy. And he went into this, you know, we read this letter that's in ER 202 to 203, and we're like, man, he's a pretty clever businessman. He was getting Mr. Worley. He wrote that Mr. Worley took a reading into this. But at the old time, he was planning to sell fuel at some point. If we conclude that, does that mean that there's not a disputed issue of material value? I mean, can we read the record the way we concluded, or what do we have to do with that? Well, actually, it's just the direct opposite. Mr. Wolfe was bamboozled by Worley right before. That's your story. That's your story. But that's what we've heard. So even if we disagree with your story, we think that the facts go the other way, or we think that you could read the facts the other way. What do we do with that? Well, if the facts can go either way, if there's evidence on either side, then that should require a jury to decide the issue. That precludes summary judgment. If I could, I'd like to address the issue with the airport defendants. We've probably run out of time here. That's a different issue. That was granted on a 12B6 motion. And the position that the district court took was, well, that action accrued in 2009. However, Mr. Wolfe never controlled HHO until 2014 when he bought out Worley. He wouldn't have been able to file an action against the city without Worley would have had to consent to that. I think something that I highlighted, and it was in 2009, and it was signed by Wolfe and Worley, and it said included in the purchase price for the facility are two existing underground fuel tanks. These tanks will be utilized to provide fuel to HRO, HHM, partners at direct cost, including all related taxes, et cetera, and to HHO and HHM tenants at the price that will be determined by the partners based on a balance between profit and hanger lease incentives pricing for invitees. Visitors to the facility will be determined by partner agreement. To the vast majority, 80% to 90% of the visitors being instructed to utilize Million Air for fueling. So they were talking about all this in 2009. Million Air is actually the predecessor of the defendants. AA acquired Million Air. Now, what that provision that Your Honor just read pertains to is the actual fueling of Wolfe's aircraft and any tenants that he might have there. It's not for fueling transient aircraft at all. Those transient... They're not pricing for invitees visitors to the facility. What are they talking about when he's talking about that? They're talking about their own tenants and maybe somebody that they invite to come in. Somebody that comes in and if they've got a spot to store your plane, has their plane there for a week or something. They can't fuel that, no. Those have to go to Million Air under that provision. So this is all anti-competitive. But getting back to the issue with the city, there's no... So it's all anti-competitive and it's in 2009. Well, ATF didn't exist in 2009, not under Wolfe's control. So to be held to a standard of clairvoyance in 2009, you'd have to foresee all this if you're going to become a fueling FBO. That's not reasonable. But that was the district court's ruling. And the problem with that is there's no way to know what's going to happen 10 years down the road. And that was not Wolfe's intent. And that also becomes a tribal issue. That's up to a jury to determine. Do you want to save some time for rebuttal? I do, Your Honor. Okay. Unless my colleagues want to ask you questions now. Okay. Thank you, Your Honor. Thank you. Okay. Is the first person going to be the 10 minutes? That's right. Oh, the five minutes is going. Judge Van Dyck, I ask you to put five on the clock. Five on and then 10. That way he doesn't incentivize to eat in her time. I'm watching. But if we have questions, you can keep answering. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Stephen Lee. I represent the defendant in Appellee City of Hawthorne. There's really one overarching issue presented in this appeal from the city's grant, a motion to dismiss in the district court. I don't have much time, so let me just ask you a real quick question. It's been bugging me, I guess, or it's difficult. Is your position that they're barred by such limitations particular to them, or is your position, and that is that they knew in 2009 or 2007, whatever, that they were planning to do this, and so they're barred? Or is your position more just a broader that somebody can't come in and ask? Because what I'm wondering is, like, if tomorrow, I don't think I can do this because I'm a judge, unfortunately, so I can't have side business, but if tomorrow I wanted to come in and ask at least one of these positions, and I don't think there's anything in the record that I wanted to, you know, back in 2009, would I be barred? Are you somehow grandfathered in from, you know, your anti-competitive conduct? Is it somehow grandfathered in because you got it in back when you entered in these agreements, so it's four years passes? Or is it only for people like the plaintiffs here that somehow you're arguing we're in business at the time? You see what I'm saying? Like, is it bothersome if your position is that once you pass that four-year mark, and assuming you're doing something anti-competitive, that it's just grandfathered in and nobody can challenge it? So our position, and that question really points to the accrual of the injury, and here the accrual of the injury, you know, is in 2007 when all of the sections of the airport were leased to defend the HLAC. If I want to come in and lease something, somebody who doesn't have any of the history that the plaintiff here had, I suddenly decide I want to get in the fuel leasing business in Hawthorne, and if I come in, then I would be barred also under your argument? I think so, Your Honor. So you can, like, grandfather an antitrust violation for all time just as it's four years has passed? That's not a very attractive argument. It would be based on the lease of the sections of the airport. Yes, if it would be based instead on, you know, not being able to use the subsequent sections of the airport, then I think there would not be a perpetual harm. Well, I was in a better position to say that when I come in and ask for you to lease it to me and you take the action to reject mine, that that is when I've actually experienced my injury, because back in 2007 when you did, remember, the antitrust violation turns off of when I'm injured, not when you do your bad deed. Like, you do your bad deed, but I get injured years later, it turns off of my injury. So my injury, it seems like, would be when I showed up and asked you for a lease, not when you did the thing. In other words, you fire the gun, but the bullet hits me, you know, years later. In that instance, the hypothetical would be when you asked for the lease. Well, then why isn't them asking for a lease? So this goes back to my question. It seems to me if that's the case, then your argument turns on whether or not they planned to do things in 2009, 2007, not when you entered into the lease. And so really it's a question of the attempt at creation of the monopoly, and that attempt at creation of the monopoly happened in 2007 and 2009. Those are the key dates at which that whole thing happened. That's when you fired the bullet, but what matters is when the bullet hits the person who's bringing the claim. And it's our position that the bullet hit the plaintiffs here in 2007 at the latest. Is it something particular to them or because of – is that true for everybody, including people that had no – that clearly had no intention of doing anything with Hawthorne, never had even heard of Hawthorne Airport back in 2007, 2009? In this case, I think it would be particular to them because they had the intention, as you noted in the record, in 2009 to engage in some negotiations. So then your argument turns on whether or not there's no dispute or issue of material fact as to whether they wanted to do something in 2009. Is that right? At least for the city's motion to dismiss, it's the combination of 2007, the lease of all sections of the airport to defendant H.A.L.L.C. Because going back to the complaint, the plain language of the complaint says that they were injured and that the violation occurred when the city leased all sections of the airport to defendant H.A.L.L.C. in 2007. That was the attempted creation of the monopoly. That was the time of the injury. And, you know, coinciding with that in 2009 are the statements that, you know, plaintiffs were looking forward to doing fueling operations. And I think, you know, the trial court that does that. I think we've already seen here that nobody disagrees that they were looking forward to doing fueling operations, but there's a difference between whether they were trying to sort of compete with, I guess, whoever their president or, you know, your client, versus whether or not they were just planning to do fueling operations for his photography business and or other tenants of their facility. Right? So just by saying that they planned to do some fueling operations doesn't answer the question as to whether they plan to actually compete with Hoffner. And so the plan to actually compete with H.A.L.L.C. stems from the injury of, you know, the monopoly. That was the attempted monopoly that was created in 2007. I think they're all interrelated and can't really be separated because the complaint, you know, it's very clear. It says that, you know, in 2007 you attempted to create a monopoly. You created, in fact, a monopoly when you leased all the sections of the airport to H.A.L.L.C. And that's how it was injured. You can create a monopoly at some point, take the action that it's going to injure somebody, but they can be injured years later by that action. Like not injured at the time because they're not planning to compete at that point. It's only, you know, years later that somebody decides to come in and so their injury. Is your position that their injury occurred in 2007 even though that everybody's injury occurred in 2007? I would say that the plaintiff's injury occurred in 2009 at the latest. All right. But if you're saying that you initially came out with, like, well, any, you know, that you got out H.A.L.L.A. oxen free in 2009, and so you can never be charged with a monopoly by anyone else other than the plaintiff. I probably misspoke, Your Honor. I think that— I don't think you misspoke. I think you realize that that's not an appealing argument to us. You tried, and the bullet hit. You got shot down on that one. So you're not taking that position now. You're taking it relative to this plaintiff. I'm taking it relative to this plaintiff. J.J. So let me be sure that I understand this. If we have a situation like yours, and someone has a cause of action, an antitrust cause of action, and they don't take any steps to pursue it, and the statute of limitations expires, and then they sell their interest or part of their interest or lease their interest to someone else, what you're saying is that that someone else, maybe four or five years later, inherits whatever deficit they may have. In other words, the statute of limitations would not get revived just because this other person came along and bought the interest that they have an obligation to investigate and review the documents and see what the situation is. That's your argument, right? I would think so, Your Honor. So basically what you're saying is that it would be unfair to have someone, say, five or years later, ten years later, take over an interest and then revive a dead cause of action simply because they didn't look carefully enough. That's your argument. Yes, Your Honor. Can I ask you just a general policy question? Because if I come in, you know, and I wait, let's say the record was super clear that I planned to do something and I waited past the statute of limitations. But if I come in and ask to lease a different section or something like that or do something different but it's still, why wouldn't you as a policy matter want to say for antitrust purposes that that is a different, that the statute of limitations on that didn't accrue until I asked? Why would you want to put the locus of the injury for the second event at the time when I may have known as opposed to when I asked? Because we don't want to have, presumably we don't want to have antitrust violations just sitting out there unable to be challenged that are ongoing. Assume for a second that your lease is an ongoing antitrust violation because nobody else can enter it. If that's true, why wouldn't we want to make it so that any time someone comes and asks you for a lease that that is the event, that's the cause of injury when you say no, right? Because that's, and even if they ask for a lease and you say no, and then they wait five years and ask for another lease and you say no, why wouldn't that second one be another injury? So I think it speaks back to the origination of the injury, which was the lease of the sections of the airport. It's the same injury. Your Honest brought up the point of, you know, getting shot in the foot, you know, stabbed in the foot. Here it's the same injury. The lease of the sections were already done. And that's exactly, you're hitting it on that. You could be saying it's the same injury because it's your foot being injured. But, I mean, a lot of people would say, you know, I got shot in the foot by Joe and then Tom came and stabbed me in the foot. And you say, well, you can't sue Tom for a tort because you got the same injury. You say, no, I think I can sue Tom for a tort because it's a different injury, even though, you know, he stabbed me right where I got shot. So, unfortunately, in this situation, the city would not be, you know, Joe, and then another city would be Tom. It's all those cities I'm asking. It's like, you know, you could characterize it either way, I think. And I just don't understand why as a policy matter we wouldn't want to make it. So I understand that we don't want to have, if the city does some act and it's a discreet act and it isn't ongoing, we don't want people to be able to sue about that act a decade later. I understand that. But the city's done some act that is an ongoing antitrust. Those leases, I mean, in theory, let's assume for a second, but those leases are an antitrust. They're anti-competitive every day that they exist because they don't allow somebody else to sell fuel. When I land my little Cessna at your airport, I have to pay overpriced fuel. That's the whole. So that injury is happening to the public. It's happening to everybody every day. Why wouldn't we want to make it so that whenever anybody comes to you and says, I'd like to lease Summit, that that triggers, that is an injury when you say no. That's the injury when you say no. So I think that's a hypothetical that need not be answered in this case here. Well, no, it absolutely needs to be answered because they asked in 2019. And if that's an injury, if that's a new discreet injury when asked in 2019, you lose on sexual limitations. But, Your Honor, it's not a new discreet injury. It's an injury that accrued in 2009. Only if you answer my hypothetical a certain way. And the answer here is that, you know, the injury accrued in 2009. I'm asking you why we want to have the answer that the injury happened in 2009 as opposed to when they asked. It doesn't seem to me to make a lot of sense. I understand you could reach that. I mean, you kind of pick one or the other, right? But why would we want to pick 2009? Because that was the date when all the sections of the airport were leased and they knew that all the sections of the airport were going to be leased. And you can bring a father in an antitrust violation. That just doesn't make sense to me. Like, well, what is the public policy in that? I mean, it's actually called the continuing violation exception. And, you know, it seems like in theory you have a continuing violation. I understand, like, how the test fits here is a little wonky. But it's just like I'm having trouble with the fact that, like, you can just insulate yourself from being challenged. How is that helpful? I mean, the whole purpose of antitrust is to protect the public. And how does that protect the public to allow you to, like, grandfather in this unlawful anti-competitive agreement? And so I'm not taking the position that an anti-competitive agreement would be unlawfully grandfathered in. I'm saying with respect to these plaintiffs that their claim is barred. And I understand that. You're going back and forth. I'm hearing both sides. You're talking out of both sides of your mouth here. So one side is concerning, and the other side maybe not so much as to the plaintiff. So, I mean, Hawthorne wants, you know, a free zone, that they can never be sued for an anti-competitive situation, the way they've constructed this. It's not the intention of the city to have an anti-competitive kind of marketplace. The position I think we're taking is a little bit more narrow, that this particular plaintiff is barred from asserting a Sherman Antitrust Act claim, because as of 2009, their injury had accrued. They knew that all sections of the airport had been leased to defend an HALLC. And you say in that sentence that you want it to be, you want it to run with the land, and anyone else that takes that on has no, can't get a, can't sue you for antitrust violation. That's not a position we're taking in any of the briefing or here, Your Honor. We're only taking a position as to these plaintiffs. Just to these plaintiffs. You can't just turn on the fact that they knew, right? Because if somebody could know and have zero, you know, I could be like a, somebody lives in the town and have read the newspaper that you've entered into a lease with all these people, but have zero intention of entering into the market, is your position really that they knew or is it that they knew and you have to be saying that they had plans to do something at that point? Or is it just knowing? I would argue that they knew and they had plans to do something. In essence, do you agree that that's what, under your theory, that's what it takes? So the reason that's important is because if there's a disputed issue of material factors as to whether they had plans, then it wasn't appropriate to dismiss your case at motion to dismiss the case. Well, so here they knew and they were injured by it in 2007 and 2009. They had plans to fuel. And I think the district court correctly granted our motion because the plain language of their complaint is really clear. It's the city created or attempted to create a monopoly in 2007 when it leased all sections of the airport. That's when it happened. That's when the crux of their complaint is. Some of the language in this case were, I mean, he literally is telling them, maybe he's lying, but Wolf was saying, was telling his then partner Worley that he should take them at his word that he was not going to sell fuel. And he was telling him he didn't intend to become a large-scale fuel seller. So there's stuff like that in the records. That would seem to create a disputed issue of material fact as to what their intentions were in 2009. So you see the difficulty. If it's just mere knowledge, then I could see how you went, but there's a real problem with mere knowledge. It's like, why is somebody injured? Just because they know about something that doesn't affect them at the time. But if it turns on whether or not they intended to become a seller at the time, then I think you have a disputed issue of material fact problem. And so here it's, you know, I again go back to the complaint where, you know, they're seeking declaratory and adjunctive relief to overturn the 2007 option so that plaintiffs can, you know, operate on those sections of the airport. That injury occurred in 2007 and in 2009 when they signed those restrictive complaints. Back to the question I asked at the very beginning, what if I was suing? I mean, that would be weird because it's a judge in the case, but what if I was suing and it was clear that I had no intention back then, would you say my injury happened in 2007? In that instance, I don't think I would take that position, Your Honor. So it all turns on whether or not it's undisputed that they had an intention to actually enter into the market at the time. And that's what I think you're, I'm trying to figure out what your arguments are, but I think everything turns on that, whether it's undisputed. If it really is truly undisputed, if there's no disputed issue of material fact, then you win. But if there's a disputed issue of material fact as to what their intentions were in 2007 and 2009, then it seems like the judge erred in issuing, in dismissing the case. I think it's actually, you know, a little bit more simple for the city because what they allege against the city is different from what they allege against the other defendants. Here they'll be simple if your position is mere knowledge is enough, but it's hard for me to see how mere knowledge works. You can understand why mere knowledge is, because just because somebody reads about it in the newspaper but they have no intention of competing at the time, how do you make the argument that they're actually injured at that time? Because that's when the alleged monopoly was created for these plaintiffs. You just injured the world at that point. I've had people that didn't plan to compete. I said for these plaintiffs because, you know, by 2007, 2009, that's when, you know, everything essentially happened, the lease on the section of the airport, the restrictive covenants, the purchase and sale agreement. Okay. All right. We've taken you way over on the questions needed to be answered for the court, so now we'll move to the person that has ten minutes. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honor. My name is Elizabeth Bradley for the Airport Defendants. Can you speak in your outside voice a little bit, a little louder? Yes. Okay. Yes, I apologize. Elizabeth Bradley for the Airport Defendants. May it please the Court, I would like to start by addressing some of the questions that the panel has had regarding the continuing violations doctrine and the fact that there is no evidence of any injury on the part of the plaintiff as a result of, I'm going to focus on, the erection of the fence. So it seems to me there's two issues in your case. Let me try to guide your. There's the issue that we, I think it's the exact same issue, is whether or not there's a disputed issue of material fact as to whether or not they were injured back in 2007, 2009. I think that's the same issue as with the city. So maybe if you could address that. And then I suppose only if they were, in fact, injured, then you have the continuing violations doctrine. The continuing violations doctrine is not really relevant if they weren't actually injured or if there's a disputed issue of material fact about whether they were actually injured because there's a disputed issue of material fact about whether they actually intended to enter into the market back. And then it's not continuing violations. It's that the fence would be sort of the first maybe manifestation. So can you address the issue that your colleague was addressing first and then the continuing violations if we agree with you on the first issue? Yes, Your Honor, of course. I believe that the knowledge on the part of the plaintiff that their leasehold was restricted, that their ownership interests in the Northrop property were restricted, was sufficient to trigger the statute of limitations in 2009. Just their mere knowledge, or is it a combination of their mere knowledge with their intention to actually open a fuel sales to the public? Or is just their mere knowledge enough? I would submit that their mere knowledge is enough. Okay, so then we have the problem I was talking about earlier. So as a good citizen of Hawthorne, I read about it in the newspaper. Slow down a little. Oh, I'm sorry. As a good citizen of Hawthorne, you know, I read about it in the newspaper. And you would say that I have been injured at that point even though I work as a, you know, I don't have any intention at that point of actually ever competing a victory in that market. As a citizen reading the newspaper, I don't think your knowledge would be rising to the level of the knowledge that the plaintiff had in this case. The plaintiff had. Okay, I'm sorry. I'm just trying to make sure that I'm trying to tease out your position. I don't want you to avoid the hypothetical in a way that doesn't help solve the legal quandary I'm trying to figure out. So assume for a second that I had exactly the knowledge that these guys had in 2009. But let's also assume for a second that I had zero intention to enter the market. I don't even, like, I'm a lawyer or whatever. You know, I don't have any. But I'm injured. Your argument would have to be that I'm injured. Because you agree that that's what starts the statute of limitations is the injury. So how can you say I'm injured by just merely knowing that there's this anti-competitive agreement when I have no intention of ever entering that market at that point? Well, I think my confusion, Your Honor, is the intention. Is Your Honor referring to the intention to enter which market? To enter the market of leasing property or selling fuel? Selling fuel to the general public. Not selling fuel to leasees of the property, but selling fuel to the general public. Competing with your client. The city doesn't have a prohibition on more than one fuel vendor. In fact, it granted the fuel concession to the plaintiff in 2017. And so this is a little bit of a confusion in the record because the master lease grants the defendants the lease and the option to lease the entire airport property that is not regulated by the FAA. And then it's the agreements between the plaintiff and the defendants that create the restriction on the sale of fuel. And so it's the purchase and sale agreement between HHO and the seller of the Northrop property that included that section 10.4 that precluded sale on the property to the public. So can I ask you a question about that? So if I enter into an agreement to not do something that I have no intention to do, how am I injured? So what I'm trying to figure out is how they can be injured unless they actually intend to do something. Why is their intent to actually compete in this market not like front and center? If you ask me to sign an agreement in order to, you know, you say you're selling me a car or something, and you say, oh, by the way, I'd like you to sign this agreement not to ever sell fuel in Hawthorne, I don't give you an extra 50 bucks off your car, I'm not sure, or I don't have any intention to ever sell fuel in Hawthorne, I'm not injured by that agreement at that point because I, precisely because I have no, even if that's an anti-competitive agreement, I'm not injured by that because I have no intention of ever entering in that market. I would respectfully disagree, Your Honor, because the injury is the limitation of the plaintiff's rights. If that's true, okay, so I understand your point, but if that's true, the problem is, I don't see how your argument doesn't prove too much because why hasn't everybody been injured, including people that aren't signing agreements or anything, but just people, you know, basically the world is injured at that point, and then we have the problem of the grandfathered and antitrust violation that nobody can challenge. But if we go back to the fact that the purchase and sale agreement and the partnership interest purchase agreement are the operative agreements that limited the plaintiff's rights to sell fuel, the master lease agreement, which is what the public would purportedly have the knowledge about, that doesn't give them knowledge of, it wouldn't give the public knowledge of the restriction on their rights to pump fuel and to sell fuel to the public. The only instruments that limit the plaintiff's ability to sell fuel to the public who are not tenants of the plaintiff's property are the purchase and sale agreement, which has not been declared illegal. It was declared unenforceable by the airport defendants because they're not a parties to that document, and the partnership interest purchase agreement, which kind of adopted and acknowledged the enforceability of that section. And so when you look at the arbitration that the defendants brought, it was to enforce the purchase, the 10.4 language in the partnership interest purchase agreement. They weren't suing on the master sale, excuse me, the master lease agreement, saying this lease agreement prevents you from selling fuel. No, the reliance to prove the inability to sell fuel is on the two private contracts, which don't involve interstate commerce. So assuming that we agreed with you on that, so it's different than the city, because the city's got the lease and you've got them, do you agree that it would be, is your position that it would be the same injury, the fence would just be causing the same injury? I know you don't think they've been injured at all because you haven't acted anti-competitive, but assume for a second that that was an anti-competitive action that caused them injury when they entered into, but when they built the fence, did that cause a different injury or did it cause the same injury? Is it a new injury in building the fence? Assuming again that the fence is an anti-competitive, I know I'm asking you to assume both things are anti-competitive injury, create an anti-competitive injury, and you don't agree with that, but if you assume that they do, do you think they're the same thing or are they different? It would not be a new injury, Your Honor. It would not be a new injury because the fence was erected only to enforce the Hawthorne H.A.'s right to protect its leasehold. So it's only because of that. You're saying it's not an injury because I think you're saying it's not a, I think that argument is that it's not actually antitrust injury at all. But let's assume for a second it is antitrust injury. If the fence is antitrust injury and the agreement is for antitrust injury, are they the same injury or are they different injuries? They would be the same injury, Your Honor, because they tie back to the lease. They're enforcing their rights under the lease to protect their leasehold. So the fence is just a physical way of saying you've agreed not to compete with me, but you're going to do it anyway, so I'm going to put a fence to keep you from doing it. Is that your position? No, Your Honor. My answer was dependent on the assumption that Your Honor asked me to make, that it was competitive. The fence was not an antitrust or even an attempt to stop the plaintiff from fueling. I understand your answer was based on an assumption. So I'm not taking you to say more than you're arguing within the context that I put you in. But if you assume that the agreement was an antitrust violation and you assume the fence is an antitrust violation, you're saying the fence isn't really a new injury because it's merely enforcing the agreement. So that's why I was asking you. You're saying that by building the fence, all we're doing is making it physically impossible for you to breach the agreement. Is that what you're saying? No, Your Honor. It is not a new injury, but not because we're still merely preventing you from fueling. We're not preventing you from fueling. The fence doesn't prevent them from fueling. There's no evidence in the record that the fence prevents them from fueling. There's no evidence. The fence was a very difficult, under this assumption, to not go to the reason why the fence was erected. The fence was erected because the plaintiff removed it. I'm trying to get into this particularly. Let's assume the fence did prevent them from fueling. Okay. Let's assume. Because I think that it would have to prevent them from fueling to be an antitrust injury, right? So I'm kind of going back to saying let's assume it's an antitrust injury. Then do you think it's the same injury or do you think it's a different injury? In other words, like having a contract provision with you that says you can't do something, let's assume that's an antitrust violation, versus physically barring you from doing something. Are those the same? Are they the same injury? Yes, Your Honor. They're the same injury because of what I said earlier, that you're basically just physically keeping somebody from doing something that you're already contractually keeping them from doing. Correct. There's no new overt act that's separated apart from the lease itself. I mean, before we had a contract, and now I've actually put handcuffs on. I've physically done something to keep you. So there is actually an act, right? It's kind of belt and suspenders is what it is. And so what I'm trying to figure out is like if you've got a belt and you've got suspenders that are doing the same, that have the same result, the same anticipated result, is the suspenders actually new if it comes along later? Or is it the same because you end up with the same result? Is it kind of an interesting, like difficult sort of theoretical question? Well, I think that it goes back to the original alleged violation because otherwise there would never be an end to the statute of limitations because one could never take any acts other than the original. But the other way to look at it is the statute of limitations could never be revived, no matter you might do 12 things in a row, that each time they get one knocked down, you do another thing that prevents them from doing it, and you'd never be able to challenge it even though you were taking a new act each time to prevent them from entering the marketplace. And that seems kind of odd, doesn't it, to say the statute of limitations just keeps on carrying on even though you're doing new things that are stopping them from entering. There are ways to do other new things other than erecting a fence that could stop them from competing. And would be a new act. There's possibilities, yes, not present in this case. But the erecting of the fence cannot be the only one. Well, I guess let's assume that if the statute hadn't run, that they could show that there was an antitrust violation. Let's assume that it hadn't run. I think the concern is that if there are things that are really going on there that are antitrust violations, who can challenge it? Is when the city was saying things like, well, essentially we can just grandfather it in because this person didn't challenge it, now no one can ever challenge it. Does the city just have free reign here? I mean, can they ever be challenged for what could be an antitrust violation? And are you speaking only to the master ground lease? Well, it seems like that there's trying to, there's an effort to get a total immunization to ever being challenged for the way that airport is run by the city and for the people there. Maybe this plaintiff blew it, but are there other people that would be able to challenge it? Or do they just, because this plaintiff blew the statute, is in perpetuity, this is fine? I don't know that I would take that position, Your Honor. However, I can say that the actual issue of whether or not this constitutes an antitrust violation or is in violation of any FAA rules or anything of that nature was not fully briefed because this was limited, this issue was limited to the statute of limitations. And from the district court's order, it's clear that for the purposes of the summary judgment motion, there was an assumption that this was an antitrust violation and that there was injury. There was an assumption solely for the purpose of statute of limitations because in the 1286 motion, there were separate arguments attacking the plaintiff's complaint and the allegations therein on these types of issues, that this is not an antitrust violation. Unless someone wants to buy the property from the plaintiff, then is that person, can that person ever challenge the situation? I think that would make a much more arguably, a much more arguable position that that person would have because I don't know that it would be fair to impute knowledge, excuse me, impute knowledge retroactively to that person. However, I would imagine that in the seller's duties of full disclosures, they would have to make disclosures that they purchased, that the plaintiff purchased the property with full knowledge of the master ground lease, with full knowledge of the section 10.4 in the purchase and sale agreement, with full knowledge of the section 10.4 in the partnership interest purchase agreement, and all of those contractual provisions that limit the plaintiff's ability to sell fuel, separate and apart from this master ground lease issue. I don't buy that it's wrong and they purchased it. Can't they just say, this is what I want to do and I'm going to challenge it because it's an antitrust violation? Can they do that? Or are you going to rely back on this person lost and therefore no one can ever challenge it? Well, I think you would probably find plenty of plaintiff's attorneys that would argue yes they could and plenty of defense attorneys that would argue no they cannot and they don't. We're kind of going round and round and we're way over time. Do either of my colleagues have any questions? Okay. Well, we've allowed you more time then. I'm sure you probably wanted to use it otherwise, but since we're going to decide the case, we get to ask the questions. Thank you very much. Thank you very much. Okay. I'm going to give a little up. We'll put that up to three minutes, but if my colleagues need extra time, then we'll go. We'll interrogate you similarly. How's that? Sounds good, Your Honor. I'm used to being a punching bag. But to answer Judge Callahan's question, the agreements are binding on all successors and signs and what have you. So it is grandfathering in this antitrust violation and perpetuity to answer that question. Now, going back to the fence. Well, Congress created a statute of limitations. I mean, one would assume they would understand that if you haven't had a statute of limitations, there is a potential that you could have this situation, right? But it violates a public policy because the public policy. Does he want us to declare that section of the statute a constitution? Well, I'm not asking for that, Your Honor. But, you know, what we have here is a situation where this airport is a public use airport that gets federal funds through FAA grant assurances, and they're required to be anti-competitive or not to be anti-competitive to have free compensation. So are you arguing that the agreement is void am initio, that it was against public policy and it shouldn't be enforced at any time? That is a position that. . . Well, I'm asking you whether it's your position, not whether it's a position. Well, it wasn't a position in the summary judgment. No. It was in the briefs. Certainly, that's what you're arguing. If there is a remand, it's certainly going to be a position. But going back to when the injury occurred. Yes, there were antitrust violations back in 2007, 2009. But the actual injury didn't occur until 2017 when they put up the fence. And the way the fence prevents fielding is because of its location, certain types of aircraft, like G-4s and 5, very large jets, can't get into that area. So it obstructs the fueling of those aircraft. And that's a problem because now we've got to fuel them using fuel trucks. That takes manpower, and that's more expensive, and it's time consuming. So the whole intent of the fence. . . The challenge is the fence actually results in the same injury in a sense that everything else. . . Since the injury is excluding you from the market, the agreement excludes you from the market. And the fence does. . . And the continuing violation doctrine requires a new and accumulating injury. I'm trying to figure out what it means by new. It seems to me their argument is that as long as the injury causes. . . It causes you the same injury, it's not new. But the problem with that is every antitrust action would always cause you the same injuries. And so, like, if somehow you got the fence torn down and they just started shooting people with airsoft guns to keep them from crossing the barrier, you know, would that be a new. . . And under their theory, I don't think it would be. So I'm trying to figure out, like, what is your position as to what constitutes a new, for purposes of the continuing violation, injury if the injury itself is actually the same injury? Well, actually, there was no injury prior to 2017 because there was no intent to enter into the marketplace. That's your position. If we agree with you, then I would agree that the first injury happens when you intend, which seems to be your first overt act would be within a statute of limitations. If we disagree with you, then it has to be a new and continuing violation. Correct? Correct, but that's the issue for the jury. Whether it's a new injury. No, intent to enter the marketplace. That turns on facts, and that's where the district court erred in granting summary, Judge. You don't think we need to even get to the new and continuing because for either the city or the private defendants because there's a disputed issue material fact as to your intent, 2005, or 2007-9. That's correct, Your Honor. 2017 starts to clock as to the airport defendants. 2019 starts to clock as to the airport. That's when we ask for the Section 8 lease, both are well within the four-year limitations period. Unless the court has any further questions, then. Well, I would say we possibly couldn't, but we possibly could. So, if either of my colleagues have any additional questions. All right. Thank you both for your lively argument today, and this matter will stand submitted. This court will be in recess until tomorrow at 9 a.m. Thank you, Your Honor. Thank you. All rise. The case is submitted.
judges: CALLAHAN, VANDYKE, Ezra